UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROMEIN ROSTAMI,                                              CASE NO.:

      Plaintiff,

                                                    JURY TRIAL DEMANDED

v.

OPEN PROPS, INC., ADI SIDEMAN,
YONATAN SELA, ERAN KALMANSON,
and BEN PERPER,

      Defendants.
_____/

## COMPLAINT

Plaintiff, Romein Rostami ("Plaintiff"), by and through undersigned counsel, sues defendants Open Props, Inc. ("Props"), Adi Sideman ("Sideman"), Yonatan Sela ("Sela"), Eran Kalmanson ("Kalmanson"), and Ben Perper ("Perper") (Sideman, Sela, Kalmanson, and Perper are collectively hereinafter "Management Team") (Management Team and Props are collectively hereinafter the "Defendants") and alleges as follows:

## INTRODUCTION

1.     This action seeks the return of 1,000 Ethereum cryptocurrency tokens procured by Defendants from Plaintiff through fraudulent means.

2.     Props is a technology company that promised to create a decentralized, digital media platform for video applications, the Props Network, that would reward its users, content creators, and developers in the form of cryptocurrency for contributing to the network.

3.     To entice investment in the venture, Defendants represented to Plaintiff and investors that the popular video platform, YouNow.com (and its 45 million plus registered users)

would be merged or integrated with the Props Network creating an instant environment for mass adoption and use.

4.     In 2017 and 2018, Props offered and sold to Plaintiff and investors the future right to cryptocurrency tokens called "Props" tokens, which would serve as the currency on this new Props Network that could be used as a utility token on the network or cashed out into fiat currency.

5.     Through these efforts, Defendants raised approximately $25 million to build the Props Network and token using Ethereum blockchain technology.  Plaintiff was one of the investors who purchased Props tokens from Defendants, having invested 1,000 Ethereum tokens in Defendants' venture.

6.     However, Defendants never created a viable decentralized network. Instead, Defendants lied to investors through industry whitepapers, pay to play promotional advertising, and other fraudulent marketing gimmicks to induce investment and utilized the venture as a vehicle to perpetuate fraud for greater financial gain.

7.     Defendants' offer and sale of Prop tokens was rife with misleading and misrepresentative material statements and omissions.

8.      Shortly after raising funds from investors, Defendants engaged in a series of actions designed to allocate such funds to themselves by transitioning the venture away as being a decentralized network and removing the ability to use Props tokens as a utility within the Props Network which resulted in the constructive delisting of the Props token from cryptocurrency exchanges making such tokens worthless.

9.     The Management Team and Props strategic partners pocketed large sums of money for their promotional efforts, and – due to their misrepresentations, factual omissions, and unlawful

action – Plaintiff will not see any return on his investment.   In sum, Defendants enriched themselves at the expense of their investors.

10.     Props was a mere instrumentality used by the Management Team to perpetrate fraud and evade subsequent attempts by investors to seek the return of their investment.  In the operation of Props, the Management Team failed to observe corporate formalities, purposely siphoned operating capital for their personal benefit, exercised crippling control over its operations and finances, created a corporate façade through the exercise of such significant control, and abandoned the venture under the guise of non-commercial viability to preserve their gains and avoid the ends of justice.

11.     As a result of Defendants' wrongful conduct, Plaintiff has been damaged and brings this action not only to recoup his investment but prevent Defendants from defrauding other investors in the future.

## THE PARTIES

12.     Plaintiff is a citizen of the United States residing in the unincorporated United States territory of Puerto Rico.

13.     Props, formerly known as YouNow, Inc., is a for profit corporation formed under the laws of the State of Delaware with its headquarters and principal place of business in New York, New York.

14.     Sideman resides in New York, New York.  Sideman founded Props and serves or served as its Chief Executive Officer at all material times stated herein.

15.     Sela resides in Cleveland, Ohio and serves or served as Prop's Senior Vice President of Business Development and Product Strategy at all material times stated herein.

16.     Kalmanson resides in Brooklyn, New York and serves or served as Prop's Chief Technology Officer at all material times stated herein.

17.     Perper resides in Brooklyn, New York and serves or served as Prop's Director of Product and Business Intelligence at all material times stated herein.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction under 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000, and Plaintiff and Defendants are citizens of different states.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(3) upon information and belief, and because:

      (i)     The wrongful conduct was directed and undertaken within the territory of this District; and

      (ii)    Defendants maintained regular contacts with and conducted a substantial portion of their business in this District.

## FACTUAL BACKGROUND

**A.     Blockchain Technology**

20.     Blockchain is an electronic distributed ledger or list of entries – much like a stock ledger – that is maintained by various participants in a network of computers.  Blockchains use cryptography to process and verify transactions on the ledger, providing comfort to users and potential users of the blockchain that entries are secure.  Well-known examples of blockchain technology are the Bitcoin and Ethereum cryptocurrencies.

21.     Blockchains generally record all transactions in the network in theoretically unchangeable, digitally recorded data packages called "blocks."  Each block generally contains a

batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain, hence the term "blockchain."

22.     For a transaction to be valid on the blockchain, all network participants generally first reach a "distributed consensus" on the validity of transactions under review.  Blockchains reach consensus by using the same cryptographic algorithm to verify each transaction submitted to the blockchain.  Once a transaction is validated on the blockchain, the transaction cannot be cancelled, reversed, or altered in any way. Throughout 2017 and 2018, numerous blockchain projects raised funding through ICOs (defined below).

**B.      Prop's ICO and the Funding of its Network Venture**

23.     Props, formerly known as YouNow, Inc., was founded in April 2011.  Since its inception, Props has been in the live streaming video industry and claims it was the "first company to popularize social, live video streaming on mobile devices in the United States."  In other words, Props operated as a broadcasting service or platform via an application where users stream their own live video content or interact with the video streams of other users in real time.

24.     Citing its 2.5 million content creators and more than 45 million registered users, Props represented that it was "uniquely positioned" to help develop a next generation digital media network and would use its video applications as a "launchpad" for the Props Network and token.

25.     In order to raise money to fund the development of the alleged new decentralized platform, Defendants offered and sold Props tokens in an initial coin offering ("ICO").

26.     An ICO is the cryptocurrency industry's equivalent to an initial public offering for stocks.  Persons and/or entities creating blockchains often create and disseminate crypto securities in the form of virtual tokens or coins.  A token or coin may entitle its holders to certain rights related to an underlying venture, such as rights to profits, share of assets, rights to use certain

services provided by the issuer, and/or voting rights.  The tokens or coins may also be traded on online exchanges in exchange for virtual or fiat currencies.

27.     Props first launched its ICO in 2017 and sold Props tokens in exchange for U.S. dollars, Bitcoin, or Ethereum through purchase agreements referred to as a "Simple Agreement for Future Tokens" or "SAFT."

28.     Props tokens were sold to investors at discounts relative to the regular cost per token.

29.     In total, Props sold approximately 184 million Props tokens to SAFT holders, for approximately $25 million (comprised of fiat currency and digital assets, such as Bitcoin or Ethereum, valued at the time of receipt).

30.     As part of the same offering, Props distributed Props tokens to advisors, employees, and the Management Team.

31.     The investors' (or Props tokens holders') payments — the approximately $25 million invested by token holders who contributed fiat currency and/or cryptocurrency of value during the ICO — was pooled and allegedly funded the creation of the Props Network and token. Unbeknownst to Plaintiff and investors, Defendants made these representations with the intent of never creating a decentralized network and blockchain where the Props tokens could be used and planned to exit the venture under the guise of non-commercial viability leaving investors with worthless tokens.

C.      **Defendants' Marketing Tactics to Induce Investment**

32.     To enhance the public's belief in the need for and effectiveness of the Props Network and token, Defendants made bold promotional representations and used public channels

to solicit and encourage the attention of Plaintiff and other investors in its ICO with whom Defendants did not have any prior relationship.

33.     Defendants promoted the Props Network and tokens through various media, including on its website and through blog posts, social media posts, online videos, presentations, and online discussion boards.

34.     For example, Sideman and Sela appeared at "ICO Summit 2017" held on September 15, 2017, ("ICO Summit") to promote "Props [Network] by younow" and related Props token and published such presentation on Props' YouTube page:



35.     During this ICO Summit, Sideman and Sela made numerous representations regarding their expertise, capabilities, and the decentralized nature of the Props Network they planned to design and build using the funds from the ICO.

36.     During this ICO Summit, Sideman represented the following:

(i)     "We practically invented mobile streaming in the US"; and

(ii)     "We're gonna take this business and this community of millions and we're going to leverage it along with a new dimension and a new layer of crypto and blockchain in order to achieve an even bigger vision and bigger opportunity and that is to disrupt digital media and with that we introduce Props."

37.     During this ICO Summit, Sela represented the following:

(i)     "Props is a decentralized digital media ecosystem";

(ii)     "Props will much more equitably distribute value generated on digital media networks";

(iii)     "Anyone can earn Props [tokens]…hold on to them or cash out";

(iv)     "The [Props] token has a lot of utility in the network.  It's deeply integrated";

(v)     "The [Props] token is used for payments, status, influence, access, compensation";

(vi)     "By making this a crypto token we open the gate for developers to build inside the platform using the token and we allow people to participate in the long term value of this network"; and

(vii)     "We are introducing crypto to thousands of influencers and millions of millennials and gen Z users."

38.     Immediately following the ICO Summit, Sela authored and published multiple blog posts boasting the fact that the Props network would be decentralized and not under the control of the Management Team:



Published in **Props Project**

Yonatan Sela
Sep 20, 2017 · 4 min read · Listen

## A Practical Path for Decentralization

8

For example, in the above September 20, 2017, post[1], Sela stated specifically that "[i]n our view, the world needs a decentralized digital media ecosystem" because "the value created in digital media is disproportionately distributed between the network operators and the users of these networks."  Additionally, Sela stated that "network operators generate hundreds of billions of dollars in enterprise value, while users only receive a tiny fraction of that value."

39.     Kalmanson similarly pushed the decentralization nature of the Props Network and token to his social media followers and the public via his Twitter account:



[1] https://blog.propsproject.com/a-practical-path-for-decentralizing-digital-media-66d3cb13fa09

40.     Perper published several blog posts focused on the representation that Props is well positioned for success through the use of YouNow.com.  Specifically, Perper represented the following[2]:

   (i)     "With an installed based of 40 million users on YouNow and relationships with thousands of influencers in the livestreaming space, [the Props Network] is well positioned to bring high affinity users onto a next generation live video application. These content creators and users will serve as our early adopters and help [the Props Network] scale rapidly, as we attract and welcome new members to our community."

   (ii)    "The economic use case of interactive video has proven profitable, as viewers are willing to pay for virtual currency in order to enhance their experience in real time. [The Props Network] will employ a similar system that is natural and familiar to these users."

41.     Defendants also posted several versions of a written document, referred to as a "whitepaper" on its website and other paid-for promotional websites, describing the venture's alleged technology, revenue model, and business plan for a decentralized network powered by the Props token.

42.     Early versions of Props' whitepapers, prior to SAFT transactions, indicated that Defendants would use the proceeds of the ICO to "create a more balanced and equitable digital media ecosystem that is not controlled by a few key actors" and detailed how the "decentralized model" would use blockchain technology "to reward its users, content creators, developers and other contributors."

43.     Specifically, the pre-SAFT whitepapers represented the following:

   (i)     Props is "a cryptocurrency that powers social participation in digital media and Rize, a new app for interactive video…will be the PROPS token's first large-scale adopter and champion."

   (ii)    "Launching in tandem with PROPS, and seeded with YouNow's community of millions, Rize will popularize the cryptocurrency"

---

[2] https://blog.propsproject.com/rize-the-first-props-powered-app-a9733f012070

(iii)    "The [Props] team is uniquely positioned" to develop "user experiences, viable economics, and platform ubiquity that consumers have come to expect";

(iv)    "For over six years, the [Props] team has worked extensively in the live streaming video space, designing real-time video experiences built on a sustainable model of content creator revenue sharing. Today, YouNow's social video application boasts over 40 million registered users."

(v)    "Since 2011, YouNow has been a pioneer in the live streaming video space and was the first company to popularize live mobile video in the U.S. In stark contrast to the monetization strategies of most social media companies, YouNow successfully invented a microtransaction-driven, two-sided economy within the context of video entertainment that allows YouNow to reward content creators. Over the last three years, YouNow has generated over $50 million in virtual goods sales and shared the majority of its earnings with its content contributors."

(vi)    "In launching the PROPS Ecosystem, the [Props] team continues to pioneer video networks via an open video platform and an ecosystem with a decentralized economy. The PROPS Ecosystem will benefit from YouNow's millions-strong user base and creator community, a new many-to-many video technology and a 40 person team with notable video and virtual economy expertise."

(vii)    "Contributors are rewarded with tokens that unlock functionality, value and status within the community. As a decentralized and transferable ERC-20 token with fixed supply, the PROPS Ecosystem is set to grow in proportion to PROPS' utilization by users."

(viii)    PROPS Ecosystem Partners will be rewarded "with a regular distribution of tokens through its Partner Rewards Program. In turn, each Partner can incent contributors by distributing rewards to participants on its own app or platform. This will support the growth of the PROPS network by driving users to receive, buy, use and hold PROPS."

(ix)    "PROPS serve as a "status" token, indicating a user's access to advanced functionality and permissions, driving users' incentive to hold them. Further, PROPS have multiple other utilities that drive demand for the currency."

(x)    "The [Props] company and team are exclusively committed to the PROPS Ecosystem. As such, [Props] plans to transition…[to] a mission of creating a more open and sustainable media ecosystem. Adopting this…status will require [Props] to act not only in its shareholders' interests, but for the benefit of the PROPS Ecosystem and all of its participants."

44.    In the initial, pre-SAFT whitepapers, the timeline for the project was represented as follows:



**TIMELINE**

| In Progress (To be announced following the Token Generation Event) | Complete (Public launch upon token distribution) | Q4 2017 | Q1 2018 | 2018 | 2018 |
|---|---|---|---|---|---|
| **Create PROPS Foundation** | **Launch PROPS-powered Rize mobile app** | **YouNow becomes a B Corp.** | **Expand use cases** | **Add additional Partners to ecosystem** | **Open-source Rize code portions & publish developer APIs** |
| Non-profit foundation with the mission of growing the PROPS ecosystem. The foundation, as one of its key functions, administers the Partner Rewards program. | Demonstrates key use cases for many-to-many video and PROPS token; Rewards System distribution active. Establishes economy and community of PROPS users. | YouNow Inc. will transition from its current state as a C Corp to become a B Corp, Benefit Corporation, with a mission of increasing the value of the PROPS Ecosystem. | Facilitate additional use cases to demonstrate flexibility and usability of many-to-many video and PROPS in various contexts. | Foundation will support Partners that adopt PROPS as their primary currency, granting them reward tokens and governance privileges, subject to adherence to basic terms of service and relative to their contribution to the growth of the ecosystem. | Open Rize for any developer to add functionality and customize various use cases. |

45.    The initial, pre-SAFT whitepaper representations were affirmed by Sideman in blog posts.  For example, on November 16, 2017[3], Sideman represented the following:

(i)     "[the Props team] only [does Props]."

(ii)    "[The Props team devotes] all of our assets – our employees, our economy, our community, our technology, and our know-how – to the service of Props."

(iii)   "[The Props team drives] our YouNow user-base to Rize, the first Props App, fueling the flywheel of the Props ecosystem."

46.    Later versions of these initial whitepapers, released after investors' SAFT transactions based on the promise of a decentralized network in tandem with the YouNow video

---

[3] https://blog.propsproject.com/all-in-760370afffc7

application(s), removed discussion of a decentralized platform and indicated that the Props Network would transition going forward as a permissioned blockchain.

47.    Permissioned blockchains are the opposite of decentralization.  In a decentralized blockchain, the network can be accessed and used by any person using the open-source software and is controlled by code that can only be altered through widespread consensus on the network. In contrast, a permissioned blockchain is controlled by a third party rather than from self-executing immutable code.

48.    An example of an open decentralized blockchain is the Ethereum network. With this open blockchain network, anyone is able to access the network and build their own applications.  No permission is necessary to build on the network.  This is why it is referred to as "permissionless."

49.    For example, individuals and entities have used this open decentralized blockchain to create financial applications that allow individuals to borrow and lend assets also known as "decentralized finance" applications. Thousands of these applications exist on Ethereum, an open decentralized permissionless blockchain, which power the value behind its native token, Ethereum.

50.    For a closed blockchain, permission is always necessary to build on such a network. In the event the individuals or organization operating the closed blockchain network cease to exist and/or maintain the network, the network dies entirely making it impossible for anyone to even ask for permission to build on the network and in turn, making the network's native token worthless.

51.    According to Defendants' February 2019 whitepaper, the data on the Props permissioned blockchain would be verified through "validators" and that Props is the only validator, and its wholly owned subsidiary, Props Public Benefit Corporation, would appoint six

other entities as validators at its sole discretion.  Thus, this action made Props the only controller of the network and not truly decentralized as represented to Plaintiff and investors.

**D.     Defendants Abandon the Props Network and Token**

52.     Throughout its ICO raise, Defendants promised to launch a decentralized network by 2018.

53.     However, as ICO investors such as Plaintiff would come to find out, the Props venture resulted in the direct opposite of the creation of a decentralized network which ultimately leads to the loss of all value associated with the Props token.

54.     Following the release of its third version of the venture's whitepaper indicating a move away from decentralization, Props decided to raise additional capital but this time through a "Regulation A" public offering with the Securities and Exchange Commission ("SEC").

55.     Under federal securities laws, any offer or sale of a security must either be registered or meet an exemption.  Regulation A is an exemption that allows companies to offer and sell securities to the public with certain disclosure requirements.

56.     By taking this route, the Props token had become a security, and Defendants now had an ongoing obligation to report information to the public via the SEC.

57.     On August 12, 2021, Sideman published a letter on the Props website announcing that Defendants were shutting down the Props Network because Props tokens' status as a security "significantly limits our ability to respond to changing market conditions in a commercially feasible manner," a decision the Management Team aggressively pursued and never imposed on them by any party or law.

58.     Additionally, Sideman's termination website post downplays the move as Props had "touched the lives of 10 million users by introducing them to crypto and giving them, for the

first time, a stake in the network in which they participated." Nevertheless, for investors such as Plaintiff, this move resulted in a loss of investment.

59.     Moreover, Sideman further states that "Props Tokens will continue to be a digital asset in the world" – but he fails to mention that by ceasing to maintain the Props Network, Defendants made the Props tokens completely worthless.

60.     By not making the network decentralized, Defendants made it impossible for investors and token holders to maintain the network on their own. As a result, (i) Props tokens could no longer be traded because a platform no longer existed (i.e., a market no longer existed); and (ii) the tokens could no longer be meaningfully traded on any secondary market - because they lost all utility when Defendants ceased operating the Props Network and left no working protocol where the tokens could be used.

61.     By seeking a "Regulation A" offering, Defendants did not seek to avoid regulatory scrutiny as most offerors seeking this election claim. Instead, Props foresaw this SEC offering as an off ramp for its scheme. First, the Regulation A offering permitted Defendants to obtain additional funds from other, non-SAFT (non-accredited) investors to increase their gains on the venture and secondly, provided a superficial, trojan horse when it was time to abandon the project.

**E.     Plaintiff's Reliance**

62.     In considering the Props Network and token investment, Plaintiff conducted due diligence which included a review of Defendants' public misstatements, misrepresentations, and omissions of material facts, including those published and made on social media, social networks, paid for press, public and private conferences, and other media referenced herein. For example, among others, Plaintiff relied on Defendants' statements concerning the following: (i) the purportedly high value of, and ability to profit from, Props tokens; (ii) Defendants' credence as

purportedly credible innovators in blockchain based on their favorable media coverage and their strategic partnerships; and (iii) Defendants' representation that they had created a viable product that would serve as a decentralized ecosystem of applications where the Props tokens would have numerous uses such as for "payments, status, influence, access, [and] compensation."

63.     In reliance of such material misstatements, misrepresentations, and omissions, Plaintiff executed a SAFT and transferred 1,000 Ethereum tokens to Props to invest in the Props Network and token.

64.     Shortly after investing in the venture, Props transferred Props tokens to Plaintiff.

65.     Defendants enticed Plaintiff to purchase Props tokens by publicly and privately making misstatements, misrepresentations, and omissions of material facts, including, but not limited to, the foregoing, non-exhaustive examples.

66.     Defendants throughout the ICO sold the Props tokens based on the representation that the Props Network would be a decentralized open network, meaning the network would be able to run regardless of whether Props abandoned the project.

67.     Rather than create a decentralized network Defendants embarked on a campaign of erasure and transition as a means as an off ramp for the project by dramatically changing the venture's structure and seeking Regulation A status with the SEC.  In other words, Defendants opted to create a permissioned centralized network that took the power out of the hands of investors and left them empty handed – which, according to Defendants, is what they allegedly sought out to prevent.

68.     Plaintiff detrimentally relied on Defendants' misstatements, misrepresentations, and omissions of material facts when he decided to purchase, acquire, and hold Props tokens.

69.     Defendants intentionally made these misstatements, misrepresentations, and omissions of material fact, knew that they were false, and did not intend to honor their obligations.

70.     Defendants failed to produce any viable good or service following the expenditure of approximately $25 million.  Plaintiff has attempted to sell his Props tokens on an exchange that would accept Props tokens but was unable to sell such tokens.  As of the date of this Complaint, Props tokens are worthless.

71.     Plaintiff has duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

## CAUSES OF ACTION

### COUNT I – FRAUD IN THE INDUCEMENT
**(Against All Defendants)**

72.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71 above as though fully set forth herein.

73.     Defendants made material misrepresentations of fact on multiple occasions, including, but not limited to: (i) Defendants represented that they had created a viable product that would serve as decentralized ecosystem of video applications; (ii) Defendants had millions of users through its integration with YouNow.com that would use their product and the Props tokens; and (iii) Props tokens would be in high demand with the ability to profit off such demand.

74.     Defendants made these representations, knew that they were false and did not intend to honor their obligations.  Specifically, Defendants never intended to create a decentralized ecosystem of video applications and create a viable product or service.

75.     Defendants made these misrepresentations for the purpose of inducing Plaintiff to rely upon them.  Defendants needed the liquidity that Plaintiff agreed to provide in exchange for Props tokens.

76.     Defendants reasonably expected that their promise to deliver Props tokens to Plaintiff would cause Plaintiff to act, specifically to invest in the Props Network and token.

77.     Plaintiff justifiably relied on the false statements when Plaintiff performed all of his obligations to purchase Props tokens.

78.     As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff has suffered damages.

<u>**COUNT II – UNJUST ENRICHMENT**</u>
**(Against All Defendants)**

79.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71 above as though fully set forth herein.

80.     Plaintiff conferred a benefit upon Defendants when he provided investment capital to Defendants in connection with the agreement to purchase Props tokens.

81.     Defendants knowingly received this benefit.

82.     Defendants retained this benefit and continue to enjoy the fruits of this labor at Plaintiff's expense.

83.     It is against equity and good conscience to permit Defendants to retain Plaintiff's investment.

84.     Defendants have been unjustly enriched and as a result, Plaintiff has suffered damages.

## COUNT III – BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
### (Against Props)

85.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71 above as though fully set forth herein.

86.     Plaintiff entered into a SAFT with Props.

87.     With every agreement a covenant of good faith and fair dealing exists that requires that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.

88.     Props invited Plaintiff to serve as an investor and contributor for their blockchain venture in exchange for investment.

89.     Props was well aware of Plaintiff's reasonable expectation of generating a return on his investment.

90.     Props breached the covenant of good faith and fair dealing when Props misrepresented to Plaintiff numerous material facts as a way to induce his investment under the false promise of profit and a highly desirable new decentralized blockchain network, and thereafter refused to generate any return on Plaintiff's investment.

91.     Props acted in a manner that acted to deprive Plaintiff of the right to receive the benefits under the parties' agreement.

92.     Such an implied promise is not contrary to any express provision of the parties' agreement, and the alleged breach is not a breach of an express provision of the parties' agreement.

93.     As a result of Props' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered damages.

## COUNT IV – ALTER EGO LIABILITY
### (Against Management Team)

94.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71 above as though fully set forth herein.

95.     Upon information and belief, at all times material hereto, the Management Team were the principals, agents, managers, alter-egos, officers, directors, advisors, and/or employees of Props.

96.     The Management Team acted within the scope of their agency, affiliation, management, alter-ego relationship, and/or employment of Props.

97.     The Management Team actively participated in or subsequently ratified and adopted, or both, all of the acts or conduct taken by Props, with full knowledge of all of the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately caused thereby.

98.     At all times material hereto, a unity of interest and ownership by the Management Team with respect to Props existed or in other words, a single economic unit operated, such that any individuality and/or separateness between them ceased to exist.

99.     Props was a mere instrumentality used by the Management Team to perpetrate fraud and a conduit through which the Management Team carried on their business for their sole benefit.  Props was and is controlled, dominated, and operated by the Management Team as their individual businesses and alter egos.

100.    In the operation of Props, upon information and belief, the Management Team failed to observe corporate formalities.  Specifically, corporate records were not maintained, and resolutions were passed and agreements entered into without necessary approvals.

101.    In the operation of Props, upon information and belief, the Management Team purposely siphoned operating capital for their personal benefit that they were not legally entitled to receive.  Specifically, members of the Management Team improperly siphoned operating capital by paying themselves above market salaries not commensurate with a technology start-up company, using Props operating capital to pay personal expenses, and by paying inflated compensation to third party entities affiliated with the Management Team.

102.    In the operation of Props, upon information and belief, the Management Team exercised complete control over the operations and finances of Props by creating a corporate façade.  Specifically, the Management Team excluded officers, directors, advisors, employees, and other third-party contractors from all material operations and financial decisions.

103.    As a result of the foregoing crippling control over Props, the Management Team intentionally steered Props into closure in order to evade investor complaints and the ends of justice.

104.    In light of the foregoing, Plaintiff has suffered damages and is entitled to a judgment against the Management Team, jointly and severally.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment in his favor and against Defendants as follows:

(i)     Impose a constructive trust on and order the return of, along with any profits derived from investing, staking, and/or yield farming, the 1,000 Ethereum cryptocurrency tokens transferred by Plaintiff to Defendants;

(ii)    Award compensatory damages arising out of Defendants' knowing, willful, and/or intentional conduct;

(iii)     Award punitive damages for Defendants' knowing, willful, and/or intentional

conduct;

(iv)     Award pre and post judgment interest as permitted by law; and

(v)     Award such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a

trial by jury.

Date: April 22, 2022                         Respectfully Submitted,

/s/ Yamina-Sarah Chekroun
Yamina-Sarah Chekroun, Esq.
New York Bar No. 5501853
VENTURE LAWYERS LLP
4610 Alton Road
Miami Beach, FL 33140
Tel: (347) 986-4426
sara@theventurelawgroup.com

Matthew M. Fischer, Esq.
Florida Bar No. 40997
MATTHEW M. FISCHER, P.A.
1931 NW 150 Avenue, Suite 278
Pembroke Pines, FL 33028
Tel: (954) 859-5558
Fax: (954) 859-5525
matt@fischerlawpa.com
(motion for pro hac vice forthcoming)

*Counsel for Plaintiff*